**MOBIL CORPORATION and Subsidiaries, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 03–1508T.

United States Court of Federal Claims.

Sept. 22, 2005.

Robert L. Moore II, Washington, DC, attorney of record for plaintiff.

George L. Squires, Washington, DC, with whom was Assistant Attorney General Eileen J. O'Connor, for defendant.

## OPINION

BRUGGINK, Senior Judge.

The matter under consideration is defendant's January 21, 2004 motion to dismiss portions of plaintiff Mobil Corporation's [1] first amended complaint for a refund of its 1997 taxes. The government (through the

---

1. The action arises out of Mobil Corporation's 1997 tax return; in 1999, Mobil Corporation merged with Lion Acquisition Subsidiary Corporation, a wholly owned subsidiary of Exxon Corporation. Immediately following the merger, Mobil Corporation (the surviving corporation) became a wholly owned subsidiary of Exxon Corporation, which changed its name to Exxon Mobil Corporation. For the sake of simplicity, we shall refer to the plaintiff as "Mobil" throughout this opinion.

Internal Revenue Service) alleges that certain claims[2] set forth in plaintiff's first amended complaint for a refund of its 1997 taxes, filed on December 9, 2003, are not justiciable because they are untimely. Specifically, defendant avers that plaintiff failed to file with the Internal Revenue Service (IRS) within the period of limitations prescribed for filing administrative claims, as set forth in 26 U.S.C. § 6511.[3] The timely filing of an administrative claim with the IRS is a statutory prerequisite to maintaining a tax refund action in this court, pursuant to section 7422(a). Therefore, defendant contends that this court lacks jurisdiction, and as a consequence, must dismiss the claims pursuant to RCFC 12(b)(1). Mobil concedes that it failed to timely file a formal request for refund with respect to certain claims enumerated in its complaint, but contends that it timely filed informal claims.

After a lengthy discovery process focused exclusively on defendant's motion to dismiss, the parties filed extensive stipulations. They were unable, however, to reach agreement on all relevant matters. Consequently, we held an evidentiary hearing May 2—May 5, 2005.[4] Post-hearing briefing is complete. Upon careful review of the extensive record, we find that Mobil timely filed claims for refund with respect to eight of the claims[5] under consideration by including them on its original tax return for 1997, which was filed on September 15, 1998. Regarding the ninth claim,[6] which relates to Enhanced Oil Recovery (EOR) tax credits, we find that plaintiff

failed to timely file an informal claim. Therefore, defendant's motion is denied in part, and granted in part, and we accordingly dismiss, with prejudice and pursuant to RCFC 12(b)(1), all portions of the complaint that relate to EOR tax credits.

## FACTUAL BACKGROUND

Plaintiff Mobil is a large, multinational corporation that faces complex federal income tax issues as a matter of course. Plaintiff and the IRS, therefore, have a long course of dealing, the details of which are relevant here.

### 1. The Audit Process Generally

Virtually every Mobil return and amended return is audited. Due to the complex nature of these examinations and the number of issues that span multiple taxable years, the IRS examines more than one taxable year at a time as part of a single audit. Examinations of original tax returns for a given taxable year are called "Return Audits." "Claims Audits," on the other hand, are triggered by the filing of a Form 1120X amended return, and are examinations of Mobil's refund claims for a particular taxable year that (1) did not appear on that taxable year's original tax return, and/or (2) were disallowed during the correlating Return Audit. Thus, in the ordinary course, Mobil files an original tax return for a each taxable year on Form 1120, triggering a Return Audit. Generally, following the Return Audit, any outstanding claims for a particular taxable year

2. As we will address in full, *infra,* defendant argues that, of plaintiff's thirteen separately-identified bases upon which it alleges it is entitled to a refund, nine were not timely filed.

3. Unless otherwise indicated, hereafter all statutory references will be to the 2000 codification of Title 26, United States Code.

4. During the four day hearing, Mobil presented three witnesses: (1) C. Terry Olson, a current ExxonMobil employee, and the Federal Income Tax Manager for Mobil during the time period relevant to the subject claims; (2) Ronald E. Cohen, a former employee who was the Federal Audit Manager for Mobil; and (3) Jeffrey A. Lambert, a former employee who served as Mobil's Audit Supervisor for Domestic Federal Audit Issues. The government presented four witnesses: (1) Richard Guastello, the IRS Case Manager/Team Manager who was assigned to

Mobil's account throughout the relevant timeframe; (2) Victoria Soderberg, an IRS Senior Team Coordinator for Mobil who has served in that capacity since the inception of the relevant events; (3) Benjamin Franklin Martin, Jr., an IRS Petroleum Engineer who worked on Mobil's EOR tax credit issues; and (4) Charles Anthony Hummel, another IRS Petroleum Engineer who worked on Mobil's EOR tax credit issues.

5. These claims are found in paragraphs 12(a) through 12(d), 12(i) through 13, 23 through 61, and 88 through 105 of plaintiff's first amended complaint, filed on December 9, 2003.

6. This claim is set forth in paragraphs 14 and 106 through 115 of plaintiff's first amended complaint.

are included on a duly filed amended tax return (Form 1120X); the amended return is thereafter the subject of a Claims Audit. Frequently, more than one audit is conducted simultaneously. For example, the audit of plaintiff's 1997 tax return (Form 1120) was examined as part of the 1995–1997 Return Audit, which commenced in April 1999 and was completed in June 2001. Two additional audits, the 1989–1991 Claims Audit (audits of the Forms 1120X filed by Mobil relative to the subject taxable years) and the 1992–1994 Claims Audit, both began in November 1999.

For large corporate taxpayers like plaintiff, the IRS assigns a Case Manager / Team Manager [7] who acts, per the parties' stipulation, as the final authority in the examination process. The Case Manager is authorized to meet with the taxpayer and bind the government in matters of procedure, planning and scheduling, proposing and settling issues, and other examination matters. The Case Manager responsible for the examinations of Mobil's tax matters during the relevant time period was Richard J. Guastello.[8] Thus, Mr. Guastello was responsible for opening each audit cycle, and also establishing the scope of each examination.

Aiding Mr. Guastello was Victoria R. Soderberg, who served as the Team Coordinator and reported directly to Mr. Guastello. Ms. Soderberg coordinated the team of revenue agents who examine the issues authorized by Mr. Guastello, including specialty examiners. Notable to our current inquiry are the three IRS Petroleum Engineers, Rachael M. Raue, B. Frank Martin, and Anna Martin. An IRS Petroleum Engineer is a member of the IRS audit team who has specialized expertise needed to examine tax items that require substantive knowledge of the oil and gas industry, such as the application of section 43, which prescribes a tax credit for the costs associated with enhanced oil recovery (EOR) efforts.

At the commencement of each Mobil audit cycle, Mr. Guastello—working with his audit team—identifies items for examination, and issues an audit plan to provide a framework for the examination.[9] The audit plan also incorporates several "boiler plate" items that have become standard practice through the parties' course of dealing. Most relevant to our discussion are the provisions regarding communication between the parties. Specifically, Information Document Requests (IDRs) are issued by IRS examining agents to Mobil via Form 4564. So-called "affirmatives" [10] are taxpayer-proposed adjustments (in favor of either party) that arise in the context of the audit cycle.

The audit plan for the 1995–1997 Return Audit states that:

> Communications from the audit team (i.e. Requests for Information) will be both oral and written. Written requests for information will be made using Form 4564, Information Document Request (IDR).

7. The IRS changed its internal staffing designations. Thus, a "Case Manager" is now called a "Team Manager." Because the Case Manager title was in use at the time during which a majority of the events that give rise to this matter occurred, we shall use that designation throughout this opinion.

8. Mr. Guastello has been an IRS employee for thirty years and a Case Manager since 1993. He began as the IRS Case Manager for Mobil prior to the 1992–1994 Return Audit. In 1995, Mobil moved its corporate headquarters to Fairfax, Virginia from Texas. Thus, prior to 1995, Mobil filed its taxes with, and had its taxes examined by, the IRS office in Dallas, Texas. Mr. Guastello testified that one of Mobil's considerations in selecting Fairfax, Virginia as its new headquarters was the assurance by the IRS that its Bailey's Crossroads, Virginia office would be able to efficiently handle Mobil's audits. To that end, Mobil wanted a dedicated Case Manager onsite.

Additionally, Mr. Guastello testified that for "the initial 1992–1994 [return audit] cycle we agreed to that, but [the IRS][ ] indicated that after the initial cycle ... I might be assigned other duties in addition to [Mobil][ ]." Tr. 690. By the time the 1995–1997 Return Audit and the 1989–1991 and 1992–1994 Claims Audits began, Mr. Guastello had, in fact, been charged with supervising four Revenue Agents, in addition to his Mobil team. Nonetheless, Mr. Guastello "always tried to make it a point ... to be there [onsite at Mobil] as much as [he][ ] could." Tr. 691.

9. The audit plan is a signed contract; the audit plan for the 1995–1997 Return Audit was signed by Mobil Officer C. Terry Olson, Assistant Secretary.

10. The term "affirmative" is specific to the Mobil–IRS relationship. Affirmatives are permitted by the audit plan.

Responses for all IDR's will be in writing unless the Coordinator determines otherwise, and, will be provided by the due date of the request.

PX 3,[11] at EMH0004918. Furthermore, the audit plan provides that:

All affirmatives should be presented to the Coordinator no later than June 30, 2000 to allow the team adequate time to review them. If affirmatives are identified after June 30, 2000, the taxpayer should meet with the Case Manager and the Coordinator to determine if these affirmatives can be considered as informal claims, or must they be filed on form 1120–X.

Affirmatives should be presented with full documentation to support the taxpayer's claim for a reduction in tax liability, including accounting records, tax files, and source documents, e.g. invoices, contracts, correspondence, etc. Undocumented affirmatives will be disallowed. Affirmatives that have been previously identified to the audit as part of the examination plan will be treated as audit adjustments and will be afforded Appeals rights.

*Id.* at EMH0004920.

The basis for the examination, therefore, be it a Return Audit or a Claims Audit, is generally a duly filed tax return and the items it reports. Nonetheless, as the quoted portion of the 1995–1997 audit plan makes plain, the audit may, at the taxpayer's request, include additional items not originally reported on the tax return currently under audit. For example, the 1995–1997 Return Audit examined Mobil's 1995 through 1997 original tax returns, but also included a number of additional claims raised by Mobil, via affirmatives, during the Return Audit.

With the above guidelines established by the audit plan, the audit issues are assigned to examining revenue agents. When the audit team concludes its examination of an issue—whether the issue was part of the filed return or raised via an affirmative—and determines that an adjustment to the tax return (favoring either party) is warranted, the

IRS issues a Notice of Proposed Adjustment to Mobil in accordance with the following:

Notices of Proposed Adjustment (NOPA) will be submitted on Form 5701 in the name of the Coordinator [Ms. Soderberg] and include his/her identification number, and will be approved and signed by the Case Manager [Mr. Guastello] and include his identification number. The [Mobil Corporation] Supervisor [Ronald Cohen] will advise the Coordinator in writing within 30 days of the submission of their tentative agreement or disagreement with the adjustment, as proposed.

PX 3, at EMH0004918.

Thereafter, upon the conclusion of each Return Audit cycle, a final Revenue Agent's Report (RAR) is issued, indicating the total amount of any adjustments to plaintiff's tax liability for the taxable years examined. In accordance with the findings set forth in the RAR, the IRS issues a Waiver of Restrictions on Assessment, via Form 870. This is the mechanism whereby the IRS reduces the RAR to a formal assessment, or as the case may be, indicates that the taxpayer has made an overpayment of tax for one or more of the taxable years examined. Executing the Form 870 allows the IRS to immediately assess and collect any deficiencies, and waives the taxpayer's right to contest the deficiencies (or overpayments) in the United States Tax Court. The Form 870 utilized by the parties at the conclusion of the 1995–1997 Return Audit included the following language, drafted by Mobil:

ExxonMobil expressly reserves the right and intends to contest some of the proposed adjustments set forth in the Revenue Agent's Report dated 6/20/01 by further administrative action, litigation in courts other than the United States Tax Court, or otherwise, including the right to file and prosecute claims for refund or credit for all taxes and interest paid herewith.

PX 7, at EMH0002709.

2. The Specific Relevant Audits

The amended complaint relates solely to plaintiff's 1997 tax liability. Mobil timely

---

11. Plaintiff's exhibits shall be cited throughout this opinion as "PX ____," defendant's exhibits shall be cited as "DX____," and citations to the transcript of the evidentiary hearing held May 2 –5, 2005, shall be cited as "Tr.____."

filed its original 1997 tax return via Form 1120 on September 15, 1998. Plaintiff claimed an entitlement to a refund of $62,719,218.00. The IRS allowed plaintiff's claimed refund in full, prior to an examination. At plaintiff's request, as indicated on its 1120, the IRS applied the full amount of plaintiff's claimed overpayment as a credit against plaintiff's estimated 1998 tax liability.

In April 1999, the IRS commenced an audit of plaintiff's original tax returns (Forms 1120) for the 1995, 1996, and 1997 taxable years (the 1995–1997 Return Audit). Commencing in November 1999, the IRS also examined plaintiff's amended tax returns (Forms 1120X) for the 1989–1991 taxable years (the 1989–1991 Claims Audit), and the amended returns for the 1992–1994 taxable years (the 1992–1994 Claims Audit). Plaintiff alleges that each of the nine specific 1997 tax refund claims currently challenged by defendant was raised in the context of at least one of these two audits. It is undisputed that the eight non-EOR issues were included on Mobil's original tax return for 1997, and disallowed, in whole or in part, by the IRS at the conclusion of the 1995–1997 Return Audit. The ninth issue relates to Mobil's EOR tax credits for 1997, a portion of which were included on Mobil's 1997 tax return. EOR credits claimed on Mobil's 1997 tax return are not at issue here.[12] Instead, the EOR tax credit issues that defendant seeks to dismiss from this action were allegedly the subject of informal claims that arose as part of the 1989–1991 and 1992–1994 Claims Audits, and were additionally submitted to the IRS in a May 10, 2001 affirmative (Affirmative 49) as part of the 1995–1997 Return Audit.

### A. The 1995–1997 Return Audit

The 1995–1997 Return Audit plan identified numerous issues that the IRS deemed necessary to examine, along with a schedule for the examination items and the tentative date for issuance of the RAR. Because of the amount of time it takes the IRS to examine the numerous, complex issues underlying Mobil audits, the IRS typically requests that Mobil grant it an extension of the statute of limitations for assessments, pursuant to section 6501(c)(4). Mobil generally grants such requests, and in so doing, receives an extension of time to file claims equal to the last day upon which the government may impose assessments, plus six months. § 6511(c)(1). During the 1995–1997 Return Audit, the IRS requested and received such extensions for both the 1995 and 1996 taxable years, but not for 1997.[13] This was so because the IRS was able to complete its audit, and thus levy additional assessments, within three years from the date Mobil filed its original 1997 tax return, as required by section 6501(a).[14] Thus, Mobil was required to file claims arising out of the 1997 taxable year no later than September 15, 2001, as the parties have stipulated.

Upon conclusion of the Return Audit, the IRS determined that, in addition to the $62,719,218.00 overpayment of tax for which Mobil claimed an entitlement on its Form 1120 for 1997, Mobil had overpaid its 1997 taxes by $3,335,576.00. Despite this IRS-indicated overpayment, the RAR disallowed claims that, if allowed, would have entitled Mobil to a greater refund of its 1997 taxes. Specifically, eight non-EOR items reported on Mobil's original tax return were disallowed by the IRS, in whole or in part, at the conclusion of the 1995–1997 Return Audit. The disallowance of the full amount of these claimed items comprises the basis of all of the non-EOR claims at issue in the subject motion.

### B. The 1989–1991 and 1992–1994 Claims Audits

As we noted above, the 1989–1991 and 1992–1994 Claims Audits are only relevant to

---

**12.** The EOR tax credits claimed on plaintiff's original tax return were not only allowed by the IRS, but were in fact increased as a result of the findings made during the Return Audit.

**13.** The extensions granted for the 1995 and 1996 taxable years extended Mobil's period for filing claims for those years until February 28, 2002.

**14.** 1997 is the only tax year in the witnesses' recent memory for which the IRS did not request an extension of the period of assessment. Consequently, the evidence before us suggests that both the IRS and Mobil mistakenly believed that Mobil also had until February 28, 2002 to file claims for the 1997 tax year.

the pending motion to the extent that Mobil alleges it made valid informal 1997 EOR tax credit-related claims as part of these audits. EOR tax credits only apply to EOR activities occurring after December 31, 1990. *See* § 43(2)(A)(iii). Consequently, the 1989–1991 and 1992–1994 Claims Audits presented one of the earliest opportunities for the parties to test the metes and bounds of this newly-available tax credit.

In early 1999, after it had filed its original tax returns for 1991 through 1997, officials at Mobil formed the belief that the company had not fully exploited the benefit of the EOR tax credit. Mobil determined that it had failed to claim EOR credits for (1) all qualifying costs for projects for which it had claimed EOR credits on its original returns ("missed costs"), and (2) certain projects that were in existence prior to January 1, 1991, but that Mobil contends nonetheless qualify for EOR credit because they represent significant expansions of existing EOR projects ("significant expansion claims"). To that end, Mobil timely filed amended tax returns (Forms 1120X) for the taxable years 1991 through 1994, which incorporated additional EOR claims of both types. Upon receipt of Mobil's duly filed Forms 1120X for the taxable years 1989 through 1994, the IRS commenced two Claims Audits in November 1999; the 1989–1991 Claims Audit and the 1992–1994 Claims Audit.

During the planning phase of the two Claims Audits, the IRS decided to coordinate the examination of EOR issues common to 1991 through 1994. One relatively minor EOR-related issue, centering on capitalized interest and capitalized overhead, was designated "Issue 66," and assigned to IRS staff working out of Dallas, Texas. Issue 66 has been resolved, and is not before us. The balance of the EOR credit issues were designated as "Issue 67," and IRS personnel out of Bailey's Crossroads, Virginia examined this issue. Because analyzing EOR credit issues requires specialized knowledge of petroleum engineering, Mr. Guastello sought assistance from IRS Petroleum Engineering Manager Tony Bertuglio. Mr. Bertuglio assigned three Petroleum Engineers, Rachael M. Raue, B. Frank Martin, and Anna Martin,[15] to aid in the Mobil audits. IRS examination of the EOR issues was accomplished as Mobil itself continued to compile the relevant data to develop its claims. A portion of this newly-compiled data related to the 1995, 1996, and 1997 tax years. It is undisputed that data relevant to the 1995–1997 tax years, and developed in the context of the 1989–1991 and 1992–1994 Claims Audit examinations of EOR issues, was provided to the IRS. The following sections discuss the legal effect, if any, of those data transmissions.

## DISCUSSION

As we noted in our introduction, defendant contests nine of the specific refund claims for 1997 presented in plaintiff's first amended complaint. Specifically, the government argues that the following refund claims were not filed, formally or informally, prior to September 15, 2001:

1. A deduction under Code section 167 for depreciation expenses attributed to gathering pipeline assets,

2. A deduction under Code sections 165 and 475 for losses with respect to credit card receivables (the "mark-to-market" claim),

3. A deduction under Code section 167 for depreciation expenses attributed to above-ground storage tanks,

4. A reduction in gain recognized under Code section 1031 attributed to certain like-kind exchanges,

5. A credit under Code section 29 for production of non-conventional fuel,

6. A deduction under Treas. Reg. Section 1.1612–3(c) attributed to delay rental payments,

7. An adjustment under Code section 481 for depreciation expense under Code section 167 attributed to gathering pipeline assets,

---

15. These same Petroleum Engineers were also tasked to examine the EOR claims that arose in the context of the 1995–1997 Return Audit. As we shall discuss, the practical effects of the staffing overlap complicate the question of whether or not valid informal EOR claims were brought for the 1997 tax year.

8. A carryover of alternative minimum tax (AMT) credits from earlier tax years,

9. A credit under Code section 43 for qualifying EOR costs incurred pursuant to qualified EOR projects.

We refer to the first eight of these issues as the "non-EOR" claims.

██ As defendant correctly states, a taxpayer cannot maintain a suit for a refund of tax unless the taxpayer first satisfies the statutory prerequisite of filing an administrative claim with the IRS, pursuant to section 7422(a). *Furst v. United States*, 230 Ct.Cl. 375, 380, 678 F.2d 147 (1982). In pertinent part, section 7422(a) states:

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions or law in that regard, and the regulations of the Secretary established in pursuance thereof.

§ 7422(a).

██ Furthermore, in order to vest this court with jurisdiction over the merits of a taxpayer's claim for refund, the taxpayer must show that it filed its claim for refund within the statute of limitations codified at section 6511(a). *Computervision Corp. v. United States*, 62 Fed.Cl. 299, 309 (2004) (citing *United States v. Dalm*, 494 U.S. 596, 602, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990), *reh'g denied*, 495 U.S. 941, 110 S.Ct. 2195, 109 L.Ed.2d 523 (1990)). Section 6511(a) states, in relevant part, that a

claim for credit or refund of an overpayment of any tax imposed by this title in respect of which the taxpayer is required

to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires later.

§ 6511(a). The applicable regulations add that "[a] properly executed ... corporation original income tax return [Form 1120] or an amended return (on 1040X or 1120X if applicable) shall constitute a claim for refund or credit within the meaning of ... section 6511 for the amount of the overpayment disclosed by such return (or amended return)." 26 C.F.R. § 301.6402–3(a)(5) (2005).

The parties agree that Mobil was required to file any claim for refund of its 1997 taxes with the IRS no later that September 15, 2001, three years after it filed its 1997 tax return. Moreover, plaintiff concedes that the EOR claims were not contained in a formal claim for refund until February 28, 2002. Nonetheless, Mobil avers that it is entitled to proceed because it timely, and adequately, raised these matters with the IRS, albeit informally.

The balance of the allegedly untimely claims—the non-EOR credit issues—were contained on Mobil's original 1997 return, filed on September 15, 1998. They were examined by the IRS during the course of the 1995–1997 Return Audit, and were disallowed, in whole or in part, at the conclusion of that audit.[16] The disallowance did not result in an assessment because they were more than offset by additional overpayments that were discovered during the course of the audit; in fact, Mobil received an additional $3.3 million refund of its 1997 taxes at the conclusion of the audit.

The government argues that these claims were not the subject of either formal or informal claims within the statutory filing period, and are thus untimely. In contrast, plaintiff contends that these types of claims were timely filed, either because (1) their

---

16. These issues were the subject of numerous exchanges during the audit. *See* PX 6(RAR); PX 20 (IRS explanation of findings re: mark-to-market issue); PX 21 (IRS explanation of findings re: gathering lines deduction and accounting method change issues); PX 23 (IRS explanation of findings re: delay rentals); PX 24 (IRS explanation of findings re: above-ground storage tanks); PX 26 (IRS explanation of findings re: like-kind exchanges); PX 27 (IRS explanation of findings re: section 29 credits); PX 6, at EMH0002756, line 7 (recalculation of allowable 1997 AMT credit amount).

inclusion on Mobil's original tax return constitutes a valid, formal refund claim, or alternatively, (2) the original tax return combined with the ensuing audit of the very claims at issue constitute a valid, informal claim for refund.

Our resolution of this motion requires us to closely examine the facts in light of the informal claim doctrine. If Mobil did not submit a valid and timely formal or informal claim with regard to any of the issues under challenge by the government, we must dismiss them for want of subject matter jurisdiction.

### 1. Informal Claims Doctrine

■ "It has long been recognized . . . that a formal claim for refund is not needed [in order to establish this court's jurisdiction]; all that is required is a timely informal claim." *Furst*, 230 Ct.Cl. at 380 (citing *United States v. Kales*, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941)). "There are three components to an informal claim." *New England Elec. Sys. v. United States*, 32 Fed.Cl. 636, 641 (1995). First, "[o]nly when it is clear from such facts and circumstances that the IRS was on actual or constructive notice that the taxpayer was asserting a right to a refund for a specific year will the court find that an effective informal claim was filed." *Deluxe Check Printers, Inc. v. United States*, 15 Cl.Ct. 175, 180 (1988), *aff'd in part, rev'd in part on other grounds*, 885 F.2d 848 (Fed. Cir.1989) (citing *Furst*, 230 Ct.Cl. at 381). Second, "the claim must describe the legal and factual basis for the refund." *New England*, 32 Fed.Cl. at 641. Finally, "an informal claim must have a written component[ ]." *Arch Eng'g Co. v. United States*, 783 F.2d 190, 192 (Fed.Cir.1986).[17] "The determination of whether a taxpayer has satisfied the

requirements for an informal claim is made on a case-by-case basis and is based on the totality of facts." *Donahue v. United States*, 33 Fed.Cl. 600, 608 (1995) (citations omitted).

### A. Notice to Commissioner that the Taxpayer is Claiming an Entitlement to Refund

■ It is not necessary that the Commissioner have actual notice that the taxpayer is claiming a right to a refund of tax; constructive notice is sufficient. *Deluxe Check Printers*, 15 Cl.Ct. at 180 (finding that the IRS had constructive knowledge that taxpayer was seeking a refund of deficiency interest through the taxpayer's valid, formal claim for refund of the principle upon which the interest was assessed). Our reading of plaintiff's briefs indicates that plaintiff interprets the constructive knowledge requirement as satisfied if the IRS should have known, based on the facts and circumstances, that Mobil was making a present demand for a refund of its taxes for 1997.[18] We agree that this is the general principle behind the constructive knowledge requirement. *See, e.g., New England*, 32 Fed.Cl. at 645 (citing *Furst*, 230 Ct.Cl. at 380–81; *American Radiator*, 162 Ct.Cl. at 115, 318 F.2d 915; *Wall Indus., Inc. v. United States*, 10 Cl.Ct. 82, 93 (1986)). That said, we believe that the correct formulation of our inquiry into the notice element should not focus exclusively on the constructive knowledge of the claim by IRS personnel, but must also consider whether that knowledge may be imputed to the Commissioner. Stated differently, we view the constructive knowledge element of the informal claims doctrine as requiring us to consider basic principles of agency. In our view, this is the correct—and logical—formulation.

---

**17.** At the outset, we note that defendant urges that there is a fourth element required for a valid informal claim: an express waiver of sovereign immunity. Moreover, the government urges that circuit precedent—dating back a number of decades—is erroneous insofar as it does not construe informal claims as requiring an express waiver of sovereign immunity. While we appreciate the tenacity of the government's argument, we are not permitted to disregard the binding precedent that exists in this circuit. *See American Radiator*, 162 Ct.Cl. at 113–114 (suggesting that it is sufficient that there is: (1) a written component, (2) some demand for refund, and (3)

"sufficient information as to the tax and the year to enable the Internal Revenue Service to commence, if it wishes, an examination into the claim.").

**18.** The relevant inquiry is the IRS's knowledge, not Mobil's. Therefore, while the testimony of Mobil employees that indicates that they did intend to file a claim in the future, but did not think that they had already filed an informal claim, is not dispositive. There is no doubt, however, that it is probative.

Certainly, even an otherwise perfectly executed, signed formal claim that is presented to a janitor employed at IRS headquarters instead of through proper channels would not provide notice to the Commissioner. The evidence relied upon to establish the informal claim must be in the possession of an authorized agent of the Commissioner in order to satisfy the element of notice.

This formulation, while perhaps more explicit in its phraseology than preceding cases, does not represent a departure from existing precedent in this circuit. It is well-established that "the basic underlying principle [of an informal claim] is the necessity to put the [IRS] on notice of what the taxpayer is claiming and that he is in fact making a claim for refund." *Donahue*, 33 Fed.Cl. at 608 (brackets in original) (quoting *Newton v. United States*, 143 Ct.Cl. 293, 300, 163 F.Supp. 614 (1958)). It is not enough that the Internal Revenue Service "have in its possession information from which it might deduce that the taxpayer is entitled to, or might desire, a refund; nor is it sufficient that a claim involving the same ground has been filed for another year or by a different taxpayer." *Am. Radiator*, 162 Ct.Cl. at 114 (citations omitted). Moreover, "documents which are merely a normal part of the [administrative] process and which do not apprise the IRS that the taxpayer is *presently seeking a refund* do not constitute an informal refund request." *Mobil Oil Corp. v. United States*, 1993 U.S.App. LEXIS 5581, *20 (Fed.Cir. 1993) (unpublished) (emphasis added) (stating the principle handed down in *Arch Eng'g*, 783 F.2d 190 (Fed.Cir.1986)).

The italicized portion of the preceding sentence requires us to address an assumption implicit in plaintiff's contentions, namely, that the IRS's actual knowledge that a taxpayer intended to file a claim *in the future* fully satisfies the element of notice for the purpose of analyzing the validity of an informal claim. We reject that contention. In our view, it must be clear that the taxpayer is making a *present* demand for refund.[19] *See id.* Rather, if the IRS is left with the understanding that a taxpayer intends to file a claim in the future, this necessarily negates the inference that a claim is then being asserted. The purpose of an informal claim is to allow the IRS "to commence, if it wishes, an examination into the claim." *Donahue*, 33 Fed.Cl. at 609 (quoting *Am. Radiator*, 162 Ct.Cl. at 113–114). A statement to the effect that a claim is forthcoming does not serve the vital purpose of inducing the IRS to commence an examination. Instead, we believe the contrary is true: a taxpayer's assertion that a claim will be filed in the future tends to dissuade the IRS from commencing an examination, even if it is aware of some of the facts and circumstances on which the taxpayer may ultimately base its claim.[20]

A contrary holding would encourage the IRS to waste resources by investigating claims that the taxpayer may ultimately abandon. Until such time as a present, actionable demand for refund is made to the IRS, evidence indicating only that a claim will be made in the future makes the prospect speculative, at best. "[I]t would be an extraordinary inroad into statutes of limitations to hold that the running of a limitations

---

19. There are exceptions to this general rule. For instance, an alternative claim contingent on a future event may provide an adequate basis for an informal claim. In *United States v. Kales*, 314 U.S. 186, 195, 62 S.Ct. 214, 86 L.Ed. 132 (1941), the Supreme Court determined that the taxpayer gave "present notice that, if the [IRS][] insisted upon changing its original decision as to the []value [of liquidated stock], she asserted that the stock had been undervalued and she had a right to a refund of said [] tax to the extent of such excess." Thus, in *Kales*, the IRS had notice that the taxpayer presently claimed a right to a refund if the IRS fulfilled the stated condition. Similarly, other cases have held that a valid informal claim was made when a claim is made presently, but does not ripen until a future event

occurs. *See, e.g., United States v. Commercial Nat'l Bank of Peoria*, 874 F.2d 1165 (7th Cir. 1989) (finding a valid informal claim where a formal claim could not be filed during the limitations period, because the event that provides the basis for the right to a refund had yet to occur).

20. We do not intend this statement to be read to mean that a present, unequivocal demand for refund is not a valid informal claim simply because the taxpayer informs the IRS that it intends to submit a formal claim at a later date. *See New England Elec. Sys. v. United States*, 32 Fed.Cl. 636 (1995). Instead, we address only those situations in which the taxpayer states a future intention to make a claim.

period stopped as soon as the defendant realized that he was a *potential* defendant." *BCS Financial Corp. v. United States*, 118 F.3d 522, 526 (7th Cir.1997).[21] Thus, our analysis of each of the claims at issue will focus on what IRS personnel knew or should have known, the role of said personnel within the IRS, and, of course, when such knowledge was obtained.

### B. Description of Basis for Refund

■ In addition to the requirement that the IRS have notice that the taxpayer is requesting a refund, the taxpayer must also make "available sufficient information as to the tax and the year to enable the Internal Revenue Service to commence, if it wishes, an examination into the claim." *Id.* There is no bright-line rule regarding level of specificity regarding the basis of the claim, however, "the claim must describe the legal and factual basis for the refund." *New England*, 32 Fed.Cl. at 641. These bases must be described with some degree of specificity, but the taxpayer "can properly rely on the very specific knowledge gained by the revenue agent in auditing its returns," so long as that knowledge is obtained within the statute of limitations. *Id.* at 645 (quoting *American Radiator*, 162 Ct.Cl. at 115). We are mindful, however, that the doctrine of substantial variance precludes a taxpayer from asserting a claim premised upon substantially different factual or legal bases after the statute of limitations has run. It is clear that "a ground for refund neither specifically raised by, nor comprised within the general language of, a timely ... application for refund to the Internal Revenue Service cannot be considered by a court in which suit for refund is subsequently initiated." *Deluxe Check Printers*, 15 Cl.Ct. at 181 (quoting *Union Pacific R.R. v. United States*, 182 Ct.Cl. 103, 108, 389 F.2d 437 (1968)). In sum, the claim must provide the degree of specificity necessary for the IRS to commence, at that point, an investigation into the claim within the statutory period.

### C. Written Component

While the cases addressing informal claims universally require a written component, there is no specific form that a writing must take. "The focus is on the claim as a whole, not merely the written component." *Am. Radiator*, 162 Ct.Cl. at 114 (citing *Newton*, 143 Ct.Cl. at 300, 163 F.Supp. 614). Thus, we do not view in isolation whatever is in writing, "ignoring all the surrounding circumstances that give it body and content." *Id.* Instead, our analysis of the validity of an informal claim necessarily entails a thorough review of all relevant facts and circumstances, including the written component.

We view the written component in light of its purpose. Namely, "the primary purpose of the written component of an informal claim is in recognition of the fact that government personnel are constantly changing, and, as such, some continuity of notice must be provided." *New England*, 32 Fed.Cl. at 644 (citing *Furst*, 230 Ct.Cl. at 380). Mobil elicited extensive testimony establishing, in this particular instance, that staffing turnover at the IRS was rare. We cannot, however, eliminate this requirement, or lessen its significance simply because serendipity intervened to prevent institutional turnover. Furthermore, Ms. Raue, whose role will be fully explored and whose knowledge is pivotal to Mobil's argument, became ill as early as March 2000, and ultimately suffered full disability. Thus, the facts at bar reinforce the need for a writing to insure continuity of notice.

### 2. Mobil's Claims

In light of the foregoing standards, we now address the facts as they apply to each of Mobil's specific claims. As we noted at the

---

**21.** In *BCS Financial Corp.*, Judge Posner proffered this instructive hypothetical:

> Suppose *B* carelessly knocks over *A*'s precious Ming vase, shattering it into a thousand pieces. *A* scowls but says nothing. *B* knows the value of the vase, knows that he was negligent in knocking it over, and knows that *A* has a reputation for being litigious. So *B* has, within moments of the accident, a belief approaching certainty that *A* will sue him, and for how much. Does this mean that the statute of limitations for negligently damaging personal property, which let us say is three years, stops running five minutes after the accident, so that *A* can if he wishes wait ten years to file his suit?

118 F.3d at 526.

outset of this section, the bulk of the claims challenged by defendant were presented as part of Mobil's original tax return and were subsequently disallowed, in whole or in part, at the conclusion of the 1995–1997 Return Audit. Because the factual basis for each of the eight non-EOR claims is identical, we shall review them together. The remaining claim—the EOR tax credit issue—rests upon distinct facts and shall be treated discretely.

### i. Non–EOR Claims

■ Plaintiff proffers two alternate theories that it alleges establish that it timely filed the following eight claims:

1. A deduction under Code section 167 for depreciation expenses attributed to gathering pipeline assets,

2. A deduction under Code sections 165 and 475 for losses with respect to credit card receivables (the "mark-to-market" claim),

3. A deduction under Code section 167 for depreciation expenses attributed to above-ground storage tanks,

4. A reduction in gain recognized under Code section 1031 attributed to certain like-kind exchanges,

5. A credit under Code section 29 for production of non-conventional fuel,

6. A deduction under Treas. Reg. Section 1.1612–3(c) attributed to delay rental payments,

7. An adjustment under Code section 481 for depreciation expense under Code section 167 attributed to gathering pipeline assets, and

8. A carryover of alternative minimum tax (AMT) credits from earlier tax years.

First, Mobil avers that its inclusion of these claims on its original tax return for 1997 establishes valid formal refund claims. Second, plaintiff asserts that inclusion of these claims on the original 1997 tax return, coupled with the parties' course of dealing during the 1995–1997 return audit—which included an examination of the very claims at issue—constitute a valid, informal claim for refund. Supporting its theories, plaintiff cites *Levitsky v. United States,* 27 Fed.Cl. 235 (1992), which presents very similar facts. The court there held that the plaintiff had established valid informal claims for refund. The government argues that neither formal nor informal claims were presented here, and that *Levitsky* was erroneously decided. Defendant argues that *Arch Engineering Co. v. United States,* 783 F.2d 190 (Fed.Cir.1986) is squarely on point, and dictates a different result from that reached in *Levitsky.*

While the parties did not include the related schedules and/or worksheets in the record before us, it is undisputed that the claims enumerated above were included on Mobil's original tax return for 1997, and that the IRS reviewed them during its 1995–1997 Return Audit.[22] Mobil's original 1997 return sought a refund in excess of $62 million. That refund was allowed in full prior to an examination of Mobil's 1997 tax return. Ultimately, Mobil was found by the IRS to have overpaid its taxes by an additional $3,335,576.00 after its overpayments were offset against what the IRS determined were its deficiencies, and the items that were disallowed (including the enumerated claims at issue here) remained "unagreed issues" at the conclusion of the audit.[23] So finding, the IRS issued,

---

**22.** The summary of the adjustments made by the IRS to Mobil's 1997 tax account are indicated on the RAR (PX 6). Also part of the RAR are Forms 886–A, which provide an explanation of each adjustment made to Mobil's taxes. A review of the Forms 886–A incorporated into the RAR for the 1995–1997 Return Audit establishes that the IRS reviewed the substance of seven of these eight claims. *See* PX 20 (Form 886–A addressing mark-to-market issue), PX 21 (Form 886–A addressing gathering lines deduction and accounting method change issues), PX 23 (Form 886–A addressing delay rentals), PX 24 (Form 886–A addressing above-ground storage tanks), PX 26 (Form 886–A addressing like-kind exchanges),

PX 27 (Form 886–A addressing section 29 credits). The eighth claim, the AMT credit issue, is a computation based upon AMT payments made in prior tax years that may be used as a credit against any 1997 AMT amount due. As this item is a mere calculation of prior years' payments credited against Mobil's 1997 tax liability, the IRS simply recomputed the credit amount without providing an explanation for the new computation via Form 886–A. *See* PX 6, at EMH0002756, line 7.

**23.** Mobil provided a written list of "unagreed issues" to the IRS on April 25, 2001, which included these claims. See PX 261.

and Mobil executed, a Form 870, Waiver of Restrictions on Assessment and Collection of Deficiency on Tax and Acceptance of Our Assessment.[24] Finally, Mobil notes correctly that, had the claims been allowed in full, it would have been entitled to a larger refund of its 1997 taxes. With those facts as a framework, we now turn to the two main cases relied upon by the parties.

Defendant relies on *Arch Engineering*, in which two companies separately filed their tax returns claiming a surtax exemption. 783 F.2d at 191. Thereafter, the IRS determined that the entities were part of a controlled group, and were only entitled to one surtax exception between them. Consequently, both entities were found deficient with regard to their prior years' tax accounts. The parties entered discussions, and ultimately reached settlements, albeit under protest. Both taxpayers executed Forms 870 prior to paying their alleged deficiencies. The forms stated that the taxpayers were entitled to file timely refund claims "as though this waiver had not been signed or executed." *Id.* The taxpayers filed formal claims for refund on November 15, 1982, admittedly more than two years after they had paid the assessed deficiencies, arguing that they had timely filed valid informal claims through their "protests, memoranda of law, Forms 870–AD and 870, and payments 'under protest.'" *Id.* at 192.

The Federal Circuit determined that the plaintiffs' "protests (including the supporting legal memorandum) were a normal part of the internal administrative process within the IRS, not any form of an actual refund request. In fact, the deficiency payments had not yet been paid and a refund claim was not yet in order." *Id.* In addition, the "language expressly added to 870–AD said, in the plainest words, that 'this offer of waiver of restric-

tion is not to be construed as a *claim for refund* or credit, *formal or informal,* concerning the matter for which the right to claim is reserved.'" *Id.* (emphasis in original). Thus, the Federal Circuit declined to find that the taxpayer had timely filed an informal claim for refund.

The facts before us differ meaningfully from those set forth in *Arch Engineering.* None of the evidence presented by the taxpayer there rose to the level of a valid formal, if general, claim for refund. Further, the taxpayers disavowed making a claim in writing, via the language added to Form 870. Here, Mobil timely filed a tax return that included its valid formal refund demand. Moreover, as the Federal Circuit noted, virtually all of the evidence relied upon by the taxpayers in *Arch Engineering* to support their alleged informal claim came prior to the payment of the tax. Thus, no refund action had ripened when the supposed claim was lodged. Here, by contrast, the claims for which Mobil sought a refund of its 1997 taxes on its income tax return had been paid at the time Mobil's Form 1120 for 1997 was filed.

The government, while acknowledging that Mobil presented valid, formal claims on its Form 1120, argues that the refund made by the IRS to Mobil prior to any examination of Mobil's 1997 tax returns requires us to find that all of the claims contained on Mobil's 1120 were paid and thus extinguished for purposes of meeting the filing requirement. We cannot accept that conclusion. Certainly, the IRS initially allowed Mobil the full amount of the overpayment Mobil claimed on its Form 1120 for 1997. The IRS then, however, examined that return, and disallowed the non-EOR claims at issue in its June 21, 2001 RAR. With respect to other items on the original return, the IRS determined that Mobil had made additional over-

---

24. As we noted in the factual background, a Form 870 allows the IRS to immediately reduce the RAR to a formal assessment, or as here, indicate that the taxpayer is entitled to a refund of an overpayment of tax. Execution of Form 870 waives the taxpayer's right to contest said deficiencies (or overpayments) in the United States Tax Court. The Form 870 executed by the parties at the conclusion of the 1995–1997 Return Audit included the following language, drafted by Mobil:

ExxonMobil expressly reserves the right and intends to contest some of the proposed adjustments set forth in the Revenue Agent's Report dated 6/20/01 by further administrative action, litigation in courts other than the United States Tax Court, or otherwise, including the right to file and prosecute claims for refund or credit for all taxes and interest paid herewith.

PX 7, at EMH0002709.

payments of tax. Thus, even though the IRS disallowed these non-EOR claims, in whole or in part, these deficiencies were more than offset by unrelated 1997 overpayments.

In our view, the IRS refund allowed prior to the examination of Mobil's 1997 taxes does not extinguish the claims contained on Mobil's original tax return for the purpose of determining whether or not the taxpayer had fulfilled the administrative claims requirement set forth in section 7422(a). Our finding is reinforced by the fact that the IRS examined each of these non-EOR issues fully and knew that Mobil disagreed with its findings. As a consequence, even if the refund payment made prior to the examination operated to extinguish the formal claims embodied in Mobil's 1997 Form 1120, those original formal claims, combined with the parties' course of dealing during the audit of those claims (conducted prior to the expiration of the period of limitations for filing administrative claims), clearly establishes all three elements of a valid informal claim, namely, (1) notice to the Commissioner that a refund is sought,[25] (2) the factual and legal basis of the claim,[26] and (3) a written component.[27]

Our holding, and our rationale, is independent of, but in harmony with, *Levitsky*, 27 Fed.Cl. 235, upon which plaintiff relies. In *Levitsky*, the taxpayer claimed a refund on its original 1980 federal income tax return. That refund was paid. Thereafter, the IRS conducted an audit, during which certain items reported on the taxpayer's original return were disallowed. Nonetheless, the IRS found that, at the conclusion of the audit, the taxpayer was entitled to an additional refund of its 1980 taxes. The items claimed on the taxpayer's original return that were disallowed during the audit remained "unagreed items" at the conclusion of the audit. Ulti-

mately, the unagreed items were brought as an action for refund in this court. We determined that the original tax return was a formal refund claim, and the ensuing audit served to clarify the basis for it with the requisite specificity within the statute of limitations for filing claims. Taken together, the tax return and the course of dealing throughout the audit fulfilled the requirements for a valid informal claim. *Id.* at 237. While *Levitsky* is not binding, we believe that it was correctly decided.

The execution by Mobil and the IRS of Form 870 does not alter our analysis. To the contrary, the Form 870 here states that "ExxonMobil expressly reserves the right and intends to contest some of the proposed adjustments set forth in the Revenue Agent's Report dated 6/20/01 by ... litigation in courts other than the United States Tax Court," PX 7, at EMH0002709. This, of course, is exactly what Mobil did when it filed the action at bar. In the end, Mobil made valid, timely claims for refund on its original tax return, those claims were developed in detail during the protracted examination period and ultimately disallowed. Mobil has, at all times, disagreed with the decision to disallow its claims; the IRS was aware of its disagreement. Whether or not the original Form 1120 would have satisfied the requirements for a formal claim, in light of the pre-audit refund, need not be resolved. We find that Mobil's original tax return, coupled with the thorough and timely development of the facts underlying the challenged claims during the IRS 1995–1997 Return Audit, satisfy the informal claims requirement.

ii. EOR Claims

There are two EOR credit issues, with different factual bases, for which Mobil alleg-

---

**25.** That the Commissioner had notice of these claims is undeniable. They were included on Mobil's Form 1120, identified as audit items in the IRS-drafted audit plan (PX 3), fully examined during the course of the audit, and included on the written list of "unagreed items" provided by Mobil to the IRS before the period for filing claims had elapsed (PX 261).

**26.** The RAR (PX 6), and the Forms 886–A incorporated into the RAR (PX 20, 21, 23, 24, 26, 27) plainly establish that the IRS was fully apprised

of the legal and factual bases for these claims within the period for filing claims.

**27.** The written component element of the informal claims doctrine may be satisfied by one of any number of documents. For example, the original, filed Form 1120 that concededly included each of these claims suffices as the written component, as does the RAR. The April 25, 2001 written list of "unagreed issues" also satisfies the written component requirement.

es it timely filed informal claims. The first category, the "missed cost" claims, ostensibly arose in the context of the 1995–1997 Return Audit. The second category, the "significant expansion" claims, purportedly came to light as part of the 1989–1991 and 1992–1994 Claims Audits, wherein the IRS consolidated the EOR issues for the purpose of review. We address these issues in turn.

The 1991 tax year was the first year that EOR tax credits were available under section 43. Both taxpayers and the IRS appear to have struggled initially in their efforts to properly interpret this new credit. This was likely due to the nature of the credits themselves, which require specialized expertise in the area of petroleum engineering to evaluate the applicability of EOR credits to particular petroleum recovery projects. In this connection, the IRS determined that it would be best to consolidate the EOR issues that spanned both the 1989–1991 and the 1992–1994 Claims Audit cycles. Thus, Mr. Guastello, the IRS Case Manager for Mobil, requested that IRS Petroleum Engineering Manager Tony Bertuglio assign a team of Petroleum Engineers to aid in the examination of Mobil's EOR claims. These same Petroleum Engineers also examined the EOR credit issues claimed on Mobil's 1995–1997 tax returns.

### a. Missed Costs Claims

■ On December 9, 1999, Mobil personnel and IRS personnel met to discuss EOR credit issues. Mr. Guastello's notes from that meeting state that Mobil "estimated that the total dollars for all years [1991–1999] is [$]110 million. 80% are thermal." PX 262. This appears to be one of the earliest discussions regarding the EOR issues; no specific projects were mentioned, and no factual basis for these claims were presented at that time. According to Mobil, its "general claim for refund based on missed costs first took tangible shape in the form of Affirmative 49, a 360–page plus document covering the years 1991 through 1997." P's Post–Hrg. Br. at 51. As we noted earlier, the audit plan for the 1995–1997 Return Audit—a signed agreement between Mobil and the IRS—specifically contemplated affirmatives:

> All affirmatives should be presented to the Coordinator no later than June 30, 2000 to allow the team adequate time to review them. If affirmatives are identified after June 30, 2000, the taxpayer should meet with the Case Manager and the Coordinator to determine if these affirmatives can be considered as informal claims, or must they be filed on form 1120–X.

PX 3, at EMH0004920.

Affirmative 49 was submitted to the IRS on May 10, 2001, in the context of the 1995–1997 audit. Plaintiff alleges that Affirmative 49 "satisfies the three basic requirements of a valid informal claim: It notifies the IRS that Mobil is making an unequivocal demand for refund with respect to EOR credits for missed costs; it lays out in detail the grounds of this claim; and it easily satisfies the written component requirement." P's Post–Hrg. Br. at 51. We do not think the matter is so easily settled.

Mobil argues that the June 30, 2000 deadline was "solely to allow the IRS to examine the affirmative during the 1995–1997 audit cycle." P's Post–Hrg. Br. at 51. Furthermore, plaintiff contends that the parties' expectation that Mobil would include Affirmative 49 in formal claims for 1995–1997 does not contradict its position that said affirmative was, itself, an informal claim.

The problem we have with plaintiff's argument is that the audit plan expressly states that Mobil bore the burden of ensuring that its affirmative would be "considered as [an] informal claim[ ], or [had to] [ ] be filed on form 1120–X." PX 3, at EMH0004920. Plaintiff's witness, Ronald Cohen, who was responsible for hand-delivering Affirmative 49 to the IRS, stated that he knew from the moment he delivered the affirmative that the IRS would not consider it during the 1995–1997 Return Audit. Tr. 256. Mr. Cohen went on to testify that he understood that the first opportunity the IRS would have to address issues not considered as part of the 1995–1997 audit "would be in conjunction with our filing refund claims and the IRS

dealing with those refund claims."[28] Tr. 272–73. Thus, the Mobil employee with the greatest direct knowledge regarding how the IRS would treat the affirmative knew that the agency would not accept Affirmative 49 as an informal claim.[29] The audit plan clearly states that, if an affirmative would not be accepted as an informal claim, Mobil was required to file a Form 1120X.

The government argues that the IRS must expressly waive its regulations regarding the form of a claim in order for an informal claim to succeed. We disagree, in keeping with precedent in this circuit. Here, however, the IRS *expressly stated, in writing*, that an affirmative would not be considered as an informal claim if submitted after a particular date (absent approval by the Case Manager, of which there is no evidence), and instead had to be incorporated into a formal request for refund. This language is not meaningless; the IRS "may insist upon full compliance with [its][ ] regulations." *Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 296, 65 S.Ct. 1162, 89 L.Ed. 1619 (1945). Under these facts, the IRS properly insisted upon compliance with its regulations with regard to the presentation of the claims contained in Affirmative 49. Mobil was aware of this fact,

and was not prejudiced by IRS insistence that Mobil duly file a formal claim. Mobil had ample time to comply with the filing regulation, but did not do so, because both the IRS and Mobil miscalculated the time for filing. P's Prop. Find. Fact ¶ 5; PX 268.[30]

We find that the IRS rejected any informal claim that may have otherwise arisen[31] via delivery to the IRS of Affirmative 49. Instead, the IRS demanded compliance with its regulations regarding filing, as it is entitled to do. Therefore, we hold that Mobil failed to timely file an informal claim with respect to EOR missed cost credit issues.

### b. Significant Expansion Claims

■ The initial factual basis for Mobil's assertion that it made a valid informal claim with respect to its so-called significant expansion claims is the December 9, 1999 meeting about EOR credit issues. Present at that meeting were: Rich Guastello, Tony Bertoglio, Anna Martin, Frank Martin, Rachel Raue, Jeffrey Lambert, and Ronald Cohen. According to meeting notes, Mr. Lambert, who served as Mobil's Audit Supervisor for Domestic Federal Audit Issues, spearheaded the discussion. Mobil informed the IRS that

---

**28.** Mr. Cohen also testified that Mobil "would not have" extended the period for assessments for 1997, even though Mobil at one time believed that the IRS had made an error in calculations that Mobil thought resulted in a "$5 million to $10 million" error in the government's favor. Tr. 268–70. Instead, it is clear from the testimony that Mobil's intent at that time was to file later a timely claim to address this issue, and other issues that could not be resolved within the period for assessments. Had Mobil permitted an extension, its February 28, 2002 formal claims for refund would have been timely.

**29.** Mobil does not contend that the December 9, 1999 meeting adequately establishes an informal claim; instead, plaintiff relies upon Affirmative 49. There is no indication that a present demand for refund was made in that meeting. To the contrary, the whole purpose of the meeting appears to be to inform the IRS that Mobil was in the process of putting together claims, but that they would not be ready for some time, and the examination of those claims (once filed) would likely be very data-intensive. Further, the meeting notes lack the requisite specificity to establish an informal claim. There was no documentation provided to establish the factual basis for the claim, nor could the amount with respect to any

particular taxable year be deduced. It is clear that the December 9, 1999 meeting and subsequent notes cannot fulfil the three elements of an informal claim.

**30.** The government objects to the plaintiff's proposed finding of fact that included the statement that IRS personnel miscalculated the period of limitations, stating that "it is irrelevant to any issue before this Court what IRS personnel may have thought as to when the statute of limitations for filing a tax refund claim expired for Mobil's 1997 taxable year." D's Resp. to P's Prop. Find. Fact ¶ 5. Further, the government contends that "there is no evidence that IRS personnel considered the matter until they began to examine the Form 1120X ... filed on February 28, 2002." *Id.* Yet, PX 268, a memo authored by Mr. Guastello, contemplates that Mobil will file its 1995–1997 claims on February 28, 2002. We find, therefore, that the IRS may not have given the limitations period much consideration until the untimely Form 1120X was filed on February 28, 2002, but that the IRS had (like Mobil) erroneously assumed that the applicable deadline for Mobil's 1997 claims was February 28, 2002.

**31.** The express rejection of Affirmative 49 necessarily precludes our finding of an informal claim.

it (1) intended to file additional EOR claims, (2) was working to compile the factual bases for these claims with respect to the 1991–1997 tax years, and (3) anticipated that the additional EOR credit claims would total approximately $110,000,000.00 across all years (both missed costs and significant expansion claims). Plaintiff presented no data with respect to the specific oil fields that would be included in its ultimate claims, nor the breakdown of the credit amount claimed by tax year. Plaintiff informed the IRS that Mobil would have to expend significant effort in order to prepare its EOR claims. Nonetheless, Mobil now asserts that the IRS was able to begin its examination of those issues at that time. We disagree. The IRS was not in a position to investigate the factual basis for the EOR issues, when Mobil itself did not have a firm grasp on the claim. The December 9, 1999 meeting is not, however, the sole basis upon which plaintiff rests its argument.

As noted elsewhere, the IRS consolidated its examination of the EOR issues raised in plaintiff's 1991–1994 amended tax returns. The examination of the EOR issues relative to 1991–1994 was assigned to IRS Petroleum Engineers, most notably, Rachael Raue. Over the course of her examination of the 1991–1994 significant expansion EOR claims, Ms. Raue began receiving data from Mobil relevant to the 1995–1997 tax years. In fact, Ms. Raue apparently took it on herself to begin requesting this data with respect to years outside the examination. She issued numerous IDRs encompassing those years. Plaintiff presented evidence that tends to support the proposition that, from its perspective, Ms. Raue was examining the 1997 EOR significant expansion issues.

Plaintiff's contentions that the IRS knew the basis for its claims, and that Mobil was asserting a right to refund for 1997, and finally that the IRS was examining its claim with respect to 1997 based upon the forego-

ing, are compelling, but ultimately unpersuasive. First, IRS Petroleum Engineer Frank Martin, who worked with Ms. Raue, testified that some of the IDRs issued by Ms. Raue had relevance to the 1991–1994 claims, even though on their face the IDRs requested data for later years. For example, Mr. Martin testified that oil well production data for 1995–1997 might serve to aid IRS analysis of whether or not, in the context of the 1991–1994 taxable years, a particular project represented a significant expansion entitled to EOR credit. Thus, the fact that the IRS Petroleum Engineers sought data for years beyond 1994 does not necessarily indicate that they were examining claims beyond 1994.

Furthermore, IRS witnesses uniformly (and credibly) testified that no examination into the significant expansion issue was authorized for tax years beyond 1994. Ms. Raue herself, the person who requested virtually all of the data for years after 1994, was unavailable to testify. It appears that Ms. Soderberg, as the primary coordinator for IRS/Mobil written communications, likely saw IDRs that referenced 1997, as did Mr. Guastello.[32] There was a disconnect, however, between what Ms. Raue was authorized to examine, and what she may have actually examined. It is undisputed that the only duly authorized open audits during this timeframe were the 1995–1997 Return Audit, and the 1989–1991 and 1992–1994 Claims Audits. And, absent a timely, accepted affirmative, only items included on the Forms 1120 or 1120X underlying the open audits were subject to examination at that time.[33]

Plaintiff argues that Ms. Raue unquestionably examined Mobil's 1997 claims, and undoubtedly knew that Mobil was claiming a refund with respect to 1997. Therefore, plaintiff argues that the IRS "unquestionably understood that Mobil was requesting EOR

**32.** It is not clear whether they also received Mobil's responses, but we shall assume that they did. Importantly, throughout most of the period during which these IDRs were issued by Ms. Raue, she was examining the EOR credits that Mobil claimed on its 1995 through 1997 original tax returns. Thus, it is a fair inference that, had Ms. Soderberg or Mr. Guastello reviewed the IDRs and noted the years for which data was requested, the IDRs would not have raised any red flags in their minds.

**33.** Mobil does not contend that it included the significant expansion EOR claims for 1997 in any such affirmative, and concedes that these credits were not included on any timely filed Form 1120 or 1120X.

credits for significant expansion projects for tax year 1997 and was examining that claim for 1997 even as the IRS was examining identical claims for 1991 through 1994." P's Post–Hrg. Br. at 48. We cannot accept plaintiff's logic. We assume, *arguendo*, that Ms. Raue presumed Mobil was seeking a refund for 1997. Nevertheless, Ms. Raue's presumed knowledge that Mobil was asserting a claim for 1997 raises more questions than it answers. Ms. Raue was a Petroleum Engineer for the IRS; she was tasked with examining the technical data relevant to the EOR tax credit issues raised by Mobil on its 1995–1997 Forms 1120, and Mobil's 1991–1994 Forms 1120X. Ms. Raue had no authority to open a claim examination for any year, much less 1997. That authority was vested solely with Mr. Guastello. Thus, even if we allow the inference that Ms. Raue had actual knowledge that Mobil was asserting an unequivocal, present claim for refund of its 1997 taxes, we do not believe that her knowledge may be permissibly imputed to the Commissioner. Our inquiry must center on the knowledge possessed by Mr. Guastello,[34] since he alone held the authority to bind the IRS.

In addition to the IDRs issued by Ms. Raue, and the aforementioned December 9, 1999 meeting, we have before us notes from meetings during which the development of the data to support the significant expansion claims for 1991–1994 was discussed, and Mr. Guastello was present. Mobil did not direct us to any notes of those meetings in its post-hearing briefing, yet we nevertheless reviewed the evidence relative to those meetings carefully in the context of determining whether the IRS had notice of Mobil's 1997

significant expansion claims. Our review of these materials does not support the proposition that anyone at the IRS, with the possible exception of Ms. Raue, believed that Mobil was making a present demand for refund based upon its significant expansion EOR claims for 1997. In fact, the meeting notes support the inference that the only significant expansion claims then pending were for 1991–1994. For example, Mr. Guastello made notes of a July 18, 2000 "case visitation." The notes were titled "Mobil 95–97," yet, the bullet point entitled "EOR Credit" states:

> Mobil will experience a significant delay in responding to EOR Credit IDRs. It could be closer to the end of the calendar year before they have all the information. This would significantly delay closing *the 1992–1994 claim*. We discussed two possibilities for resolving this problem. We could (1) hold the case open until December which would mean closing in mid–2001 or (2) we could disallow the claim and Mobil can re-file when they have all the information. Terry prefers we hold open and he will get back to us on the specifics of responding to the EOR Credit IDRs.

PX 91 (emphasis added). We think it is clear that, irrespective of the "Mobil 1995–1997" heading, any EOR issues discussed related to the taxable years of 1992–1994. We find no support for the proposition that the IRS (and not just Ms. Raue) was aware that Mobil was presently demanding a refund for 1997 based upon the significant expansion EOR issues.

We noted earlier that Mr. Guastello likely received copies of Ms. Raue's IDRs.[35] Ms.

---

34. To clarify: we feel that whoever possessed knowledge of the facts underlying the claims, such that they had constructive knowledge that plaintiff was asserting a right to a refund of its 1997 taxes, had to be responsible for, or at the very least part of, the claims processing hierarchy. Thus, if Ms. Soderberg, who is the primary point of contact between the parties, had the requisite knowledge, we think that her knowledge (actual or constructive) could be imputed to Mr. Guastello. Ms. Raue, however, did not report directly to Mr. Guastello or Ms. Soderberg. As a Petroleum Engineer, she reported to the IRS Petroleum Engineering Manager, Tony Bertuglio and had no responsibilities with respect to processing claims; her job was confined to ana-

lyzing the technical data and making recommendations regarding EOR credit availability based on such data. The 1995–1997 Return Audit was her first large case audit, as she had only joined the IRS in late 1998/early 1999; she had no prior tax or accounting background. Not only was she outside of the claim processing hierarchy, but she also lacked even apparent authority to bind the IRS in claim filing matters.

35. Mobil and the IRS used a "paperless auditing system." While it is not entirely clear form the record, we do not think that Mr. Guastello received hardcopy versions of said IDRs. In fact, he may only have seen that Ms. Raue had issued said IDRs, and not the IDRs themselves.

Raue was authorized, however, to simultaneously examine EOR issues in the context of the 1989–1991 and 1992–1994 Claims Audits, and the 1995–1997 Return Audit. Moreover, the data requested and received by Ms. Raue was of a technical nature. Hence, we do not infer from Mr. Guastello's receipt of IDRs issued by Ms. Raue, and which requested data beyond 1994, support for the proposition that Mr. Guastello knew that Ms. Raue was impermissibly requesting information on EOR issues that were not being examined as part of the 1995–1997 audit. Nor do we believe that he knew, or should have known, that she had begun an examination of significant expansion claims for 1997. At best, we think that Mr. Guastello, and/or the personnel over which he exercised management authority, knew that Mobil was in the process of compiling facts in order to make additional significant expansion claims in the future, and with the requisite specificity under the Treasury Regulations.

As further support for our conclusions regarding the element of knowledge, we note that both parties labored under the misapprehension that the time for filing claims for 1997 did not expire until February 28, 2002. Neither party believed that Mobil had a pressing need to file its significant expansion claim until Mobil had taken the time to fully develop the factual bases therefor. There was no sense of urgency, and thus, no perceived need for Mobil to attempt to preserve its claim by either, (1) submitting a general refund demand that it would be allowed to

clarify later, or (2) asking the IRS to extend the period of limitations.[36]

In sum, we find insufficient evidence to support Mobil's contention that it made a demand for refund with the requisite degree of factual specificity.[37] Furthermore, we find that Mobil has not met its burden of establishing that the IRS had knowledge that it was asserting a present demand for refund on the basis of the significant expansion EOR credit issue. We therefore hold that plaintiff failed to make a valid informal claim for refund of its 1997 taxes with respect to the significant expansion EOR issue.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the claims set forth in paragraphs 14 and 106 through 115 of plaintiff's first amended complaint is GRANTED, pursuant to RCFC 12(b)(1). Defendant's motion to dismiss the claims set forth in paragraphs 12(a) through 12(d), 12(i) through 13, 23 through 61, and 88 through 105 is hereby DENIED.

The parties are hereby directed to submit a joint status report to the court by October 21, 2005.

**IT IS SO ORDERED.**

---

36. Nor even, as we indicated *supra,* at note 25, did Mobil agree to the IRS request to extend the period of limitations.

37. The notes from the December 9, 1999 meeting, as we discussed, failed to apprise the IRS of

the factual basis with anything close to the specificity needed to permit the IRS to commence an examination. Mobil itself had not yet compiled those facts.